IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION
Civil Action No. 1:18-cv-133-WO-LPA

| | | |
|---|---|---|
| Dorothea Robinson, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| vs. | ) | *Plaintiff's Memorandum in Opposition* |
| | ) | *to Defendant P&G's Motion to Dismiss* |
| | ) | *the Amended Complaint* |
| The Proctor & Gamble Manufacturing | ) | |
| Company, Scott Spillmann, MD and | ) | |
| Candy Wright, | ) | |
| *Defendants*. | ) | |

## STATEMENT OF RELEVANT FACTS

The Plaintiff was originally hired by Defendant P&G in approximately August, 1989 as a Technician in the state of Georgia. However, she voluntarily relocated to Greensboro, NC in 2013, and continued her employment with P&G at its Greensboro/Browns Summit, NC facility, working as a Registered Nurse in P&G's Vibrant Living Health Center. (Amended Complaint ¶8). In her capacity as a Registered Nurse, the Plaintiff was responsible for occupational health care assessments for P&G employees, handling workers' compensation claims, FMLA and other employee medical issues that impacted the employees' ability to work. (*Id*. ¶9). Sherry Spencer, Human Resources Manager, was her immediate supervisor and direct report. (*Id*. ¶ 10).

In approximately July, 2013, the Plaintiff applied for a promotion to the Health Systems Manager position, which was essentially a Nurse Manager position. (*Id*. ¶11). Although she was qualified for the position, P&G officials failed to follow the normal hiring protocol which forced the Plaintiff to obtain assistance from higher ranking P&G officials. (*Id*. ¶12). After

1

approximately one (1) year of questioning P&G, and specifically Spencer, regarding the reason(s) for failing to promote her pursuant to company policy, the Plaintiff was granted the promotion to the Nurse Manager position. (*Id.* ¶13).

In approximately November, 2016, Defendant Candy Wright, was hired to the position of Nurse Manager with the same or substantially similar job responsibilities as the Plaintiff. (*Id.* ¶15). The newly hired Wright had less education and work experience with P&G than Plaintiff. (*Id.* ¶14). Both the Plaintiff and Wright worked as on-site nurses for P&G at the Guilford County (Greensboro/Browns Summit) facility under the medical license of Defendant Spillmann. (*Id.* ¶16). Spillmann worked as an off-site contract physician for P&G, but was not an employee of P&G. (*Id.* ¶¶17, 18). Although she worked under the license of Spillmann, the Plaintiff was responsible for evaluating, assessing and authorizing payment for invoices submitted to P&G for services provided by Spillmann. (*Id.* ¶19).

In January, 2017, Wright questioned the Plaintiff about P&G's benefits and during that conversation, the Plaintiff learned that Wright was being paid a higher salary than she. Shortly thereafter, the Plaintiff approached Spencer and inquired about the difference in salary between herself and Wright, and whether this was disparate treatment based on race. Spencer refused to explain the difference in salary and warned the Plaintiff that she should not know another manager's salary. (*Id.* ¶20).

Wright was aware that the Plaintiff inquired of Spencer the reason(s) Wright's salary was higher than hers and that the Plaintiff felt the disparity in pay was discriminatory. (*Id.* ¶21). After Spencer refused to explain the difference in salary, the Plaintiff complained to Terri Rouleau, Sr. Human Resources Manager and Spencer's supervisor. Rouleau likewise explained that the

Plaintiff should not know another manager's salary and avoided responding to the Plaintiff's inquiry. (*Id.* ¶22).

In approximately February, 2017, the Plaintiff applied for a position on P&G's disability board. She immediately asked Spencer for her support. Spencer informed the Plaintiff that she would have to speak with Rouleau before providing support. Several days later, Spencer informed the Plaintiff that neither she nor Rouleau would support her in her application even though the Plaintiff was qualified for the position on the disability board. A position on the board would have further advanced her career and provided her with excellent growth opportunity within P&G. (*Id.* ¶23).

In approximately March, 2017, the Plaintiff became aware of training being provided to Wright by P&G which was designed to further Wright's career within P&G. The Plaintiff questioned Spencer about Wright's training and requested that she be allowed to receive additional training as well. However, the Plaintiff's request for additional training was denied. (*Id.* ¶24).

Both Spencer and Rouleau were aware that a position on the disability board and additional training would provide the Plaintiff with growth opportunity within P&G, and by denying her request for support and training, the Plaintiff would be deprived of future promotions and would be viewed as less qualified when compared to Wright. Further, both Spencer and Rouleau were aware that the Plaintiff would not receive the position on the disability board without their support, as this was company policy. (*Id.* ¶25).

In approximately April, May and June, 2017, the Plaintiff spoke with several managers and human resources staff at P&G and explained her concerns regarding the disparate treatment related to her salary and training. (*Id.* ¶26, 28, 29). Also, in approximately April, 2017, the

Plaintiff completed a mandatory compliance survey wherein she indicated that P&G was engaged in unethical practices based on the discrimination and disparate treatment she experienced related to her salary and employment opportunities. (*Id.* ¶27).

Thereafter, Wright informed Spillmann and others, that she had concerns regarding the Plaintiff's nursing skills and essentially accused the Plaintiff of giving poor care to P&G employees which on at least one occasion allegedly placed an employee in a life-threatening condition. (*Id.* ¶¶54, 60). In response, P&G initiated an investigation into the Plaintiff's job performance in an effort to find a reason to discredit her in retaliation for her complaints of unethical and discriminatory conduct in the workplace. (*Id.* ¶31). The investigation included, among other things, a concerted effort between Wright and Spillmann to review and scrutinize medical files the Plaintiff had worked on over the course of her employment since January 1, 2017. (*Id.* ¶32).

Also, in the summer of 2017, Spillman submitted invoices to the Plaintiff for payment that were untimely, factually incomplete and/or inaccurate, which was a violation of P&G policy. As a result, the Plaintiff refused to approve the invoices because she lacked the appropriate information to do so. Thereafter, in July, 2017, the Plaintiff informed Finance Manager, Carla Mitchell and Spencer that Spillmann's invoices could not be approved because of the lack of appropriate data. (*Id.* ¶¶33,34). Shortly thereafter, Spencer informed the Plaintiff that there had been several complaints made against her by unspecified and unnamed employees. (*Id.* ¶35). Spillmann, upset by the Plaintiff's actions, did not want her to work under his license. (*Id.* ¶43). The Plaintiff's refusal to approve Spillmann's invoices impacted him negatively, both financially and professionally. (*Id.* ¶44). Thus, Spillmann had an independent personal stake in achieving his goal of having the Plaintiff's employment terminated. (*Id.* ¶¶46, 49). Moreover, Spillmann was

aware that if he refused to allow the Plaintiff to work under his license, P&G would have to terminate her employment. (*Id.* ¶45).

On August 31, 2017 Rouleau informed the Plaintiff that its investigation revealed no intentional wrongdoing on her part; however, P&G terminated the Plaintiff nonetheless. (*Id.* ¶40). Prior to engaging in protected activity, the Plaintiff was regarded by P&G as a good employee and had not been disciplined for poor job performance. "But for" her opposition to discrimination in the workplace and engaging in protected activity, the Plaintiff would not have been terminated. (*Id.* ¶¶ 42, 48). Furthermore, the employees responsible for making decisions about her employment, including Wright, Spillmann, Spencer, Pelligrini and Rouleau, were aware that she had engaged in protected activity by articulating her opposition to discriminatory treatment in the workplace due to her race. (*Id.* ¶50). P&G's reason for the Plaintiff's termination from employment is pretextual, and a motivating factor for terminating her was due to race discrimination and in retaliation for engaging in protected activity. (*Id.* ¶¶47, 52). At the time of her termination, the Plaintiff had been employed with P&G for approximately twenty-eight (28) years and would have been eligible to retire with full benefits had she worked for three (3) additional years (2020). (*Id.* ¶90).

In approximately September, 2017, Wright was instructed by P&G to submit a complaint to the North Carolina Board of Nursing against the Plaintiff wherein Wright repeated false allegations about the Plaintiff. (*Id.* ¶¶36, 37, 53, 54, 60). Wright made these statements without having personal knowledge of the entire situation and the statements were based on hearsay and unsubstantiated information regarding the Plaintiff's prior employment and nursing skills. (*Id.* ¶54). Also, Wright was aware of the Plaintiff's EEOC Charge and informed the Board that the

Plaintiff had filed an EEOC Charge. (*Id.* ¶55). Wright expressed a negative opinion to the Board about the Plaintiff's EEOC Charge stating that the Plaintiff was "in complete denial." (*Id.* ¶57).

Wright and Spillmann, as well as other P&G officials knew or should have known the accusations and statements were false since, among other reasons, Wright had not worked long enough or closely enough with the Plaintiff to make such statements. (*Id.* ¶¶ 56, 59). The statements were published by Wright to a third party or parties, who had no business interest in or need to know; and the statements were made in an effort to cause the Plaintiff's termination in retaliation for complaining about disparate treatment involving Wright. (*Id.* ¶69). The false statements made to Spillmann were considered to be made to a third party since he was an independent contractor and not an employee of P&G. (*Id.* ¶70). Alternatively, if Defendant Spillmann was an agent of P&G such that he and P&G are considered a single entity, the exception to intra-enterprise conspiracy is invoked since Spillmann was pursuing a personal economic interest in Plaintiff's termination separate from P&G. (*Id.* ¶93). The benefit accruing to Spillmann from his conspiracy was not only the benefit associated with the Plaintiff's termination, but also that Spillmann would benefit monetarily by having someone other than the Plaintiff review and approve his invoices. (*Id.* ¶91). Spillmann's personal economic interests were furthered by the objectives of the alleged conspiracy. (*Id.* ¶¶85, 92). Finally, Wright was an agent of P&G at the time she made the false report to the Board and P&G knew the report was false and instructed Wright to make the report nonetheless. (*Id.* ¶76).

Defendants' Wright and Spillmann, as well as other employees of P&G, including Spencer, were all aware that the Plaintiff had complained of race discrimination and disparate treatment in the workplace. As a result, the Plaintiff contends that these employees engaged in a concerted effort to terminate her employment. (*Id.* ¶81).

6

An agreement existed between two or more persons, including but not limited to

Spillman, Wright and Spencer, to do an unlawful act (that is, retaliate against the Plaintiff for

complaining about discrimination in the workplace, and/or for reporting that Spillman's

financial and accounting reports, invoices and records had not been prepared accurately in

violation of law and company policy, and/or for refusing to violate the law and company policy

by approving and authorizing Spillmann's inaccurate invoices). Further, as a result of acts done

in furtherance of, and pursuant to the said agreement, the Plaintiff suffered damages. (*Id.* ¶82).


## STANDARD OF REVIEW

The purpose of Rule 12(b)(6) of the Federal Rules of Civil Procedure is to permit trial

courts to terminate lawsuits "that are fatally flawed in their legal premise and destined to fail,

and thus to spare litigants the burdens of unnecessary pretrial and trial activity. *De Sole v. United

States*, 947 F.2d 1169, 1178 n. 13(4th Cir. 1991); *Advanced Cardivascular Sys., Inc. v. Scimed

Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993). The court must presume that all well-

pleaded allegations are true, resolve all doubts and inferences in the pleader's favor, and view the

pleadings in the light most favorable to the non-moving party. *Edwards v. City of Goldsboro*,

178 F. 3d 231, 243-44 (4th Cir. 1999); *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th

Cir.1993).

Pursuant to Rule 8, a pleading is merely required to set forth "**a short and plain

statement**" of the claim sufficiently particular to give the court and the parties' notice of the

transactions or occurrences intended to be proved showing that the pleader is entitled to relief…

Rule 8(f) states that all pleadings shall be so construed as to do substantial justice. Dismissals

under Rule 12(b)(6) are disfavored and, in view of the rules' "Notice Pleading" requirements, are

not routinely granted. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Leleux v. United States*, 178 F.3d 750, 754 (5th Cir. 1999).

## ARGUMENT

### I. PLAINITFF'S CLAIMS FOR RETALIATION AGAINST P&G SHOULD NOT BE DISMISSED

In the present case, the Plaintiff has alleged claims for retaliation against Defendant P&G under two (2) separate and distinct statutes; Title VII of the Civil Rights Act of 1964, as amended in 1991, and 42 U.S.C. §1981. The "remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent." *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 461, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). Title VII provides important administrative remedies and other benefits that § 1981 lacks. See *id.,* at 457–458, 95 S.Ct. 1716 (detailing the benefits of Title VII to those aggrieved by race-based employment discrimination). *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 455, 128 S. Ct. 1951, 1960, 170 L. Ed. 2d 864 (2008).

"To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove (1) that she engaged in a protected activity, as well as (2) that her employer took an adverse employment action against her, and (3) that there was a causal link between the two events." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (internal quotations omitted). However, to survive a motion dismiss, a plaintiff need not plead a prima facie case. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002). Instead, a plaintiff need only satisfy the *Iqbal*-pleading standard in alleging sufficient facts to state a claim. *Ashcroft vs. Iqbal,* 556 U.S. 662, 678 (2009). An employee's opposition to an unlawful employment practice, or participation in an investigation, proceeding or hearing under Title VII, is referred to

8

as "protected activity." An employee's formal or informal complaints to a supervisor regarding unlawful discrimination is a "protected activity" and actions taken against the employee after such complaints may constitute retaliation. *Wu vs. Thomas*, 863 F.2d 1543, 1548 (11th Cir. 1989).

The Defendant argues that the plaintiff's claims for retaliation should fail because the allegations in the Amended Complaint admit that P&G was justified in terminating Plaintiff's employment after Spillmann refused to allow Plaintiff to work under his license; however, it fails to point to such an admission in the Amended Complaint. In fact, the Amended Complaint clearly alleges that P&G's reason for the Plaintiff's termination from employment is pretextual, and, that the motivating factor for terminating her was due to race discrimination, and in retaliation for engaging in protected activity. (Amended Complaint ¶47). Moreover, the Plaintiff's assertion that Spillmann was aware that if he refused to allow the Plaintiff to work under his license P&G would have to terminate her employment, relates to the pretextual reason for the Plaintiff's termination. (Amended Complaint ¶45). Pretext is further alleged by the Plaintiff since she was informed that P&G's investigation revealed no intentional wrongdoing on her part; however, terminated the Plaintiff nonetheless. (Amended Complaint ¶40). When drawing all inferences in favor of the Plaintiff, the allegations are sufficient to survive a Motion to Dismiss on this issue.

Facts supporting a causal nexus between the protected activity and the Plaintiff's termination are alleged abundantly in the Amended Complaint. First of all, the Plaintiff complained to *several* managers and at least two (2) Human Resources staff that she felt she was being subjected to race discrimination and disparate treatment based on the pay difference and training between herself and Wright. (Amended Complaint ¶¶20, 21, 22). Furthermore, Defendants' Wright and Spillmann, as well as other employees of P&G, including Spencer and

9

Rouleau, were all aware that the Plaintiff had complained of race discrimination and disparate treatment in the workplace. Each of the aforementioned employees also played a role in the decision to initiate an investigation into the Plaintiff's job performance and ultimately terminate her employment. (Amended Complaint ¶¶50, 81).

Finally, the Plaintiff performed her job satisfactorily, did not receive any reprimands or complaints regarding her job performance, or become the subject of an investigation until *after* she complained of race discrimination and disparate treatment in the workplace. (Amended Complaint ¶42).

The Defendant improperly relies on the Supreme Court's holding in *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 355–56, 133 S. Ct. 2517, 2530, 186 L. Ed. 2d 503 (2013) in support of its argument that the plaintiff has failed to allege a causal link between her engaging in protected activity and the employer's adverse employment action. In *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249–53 (4th Cir. 2015), our appellate court opined that Foster did not proceed on her retaliation claim by direct evidence. Rather, she proceeded under the pretext framework, which *Nassar* does not purport to address. Therefore, the court decided what effect, if any, *Nassar* has on a retaliation plaintiff's burden under the *McDonnell Douglas* framework.

The Fourth Circuit further opined in *Foster* that *"Nassar* involved a post-judgment motion for judgment as a matter of law in a mixed-motive case, and therefore did not address the elements of a prima facie case of retaliation under the pretext framework. 133 S.Ct. at 2524." The Court recognized a disagreement between its sister circuits regarding whether *Nassar* has any bearing on the causation prong of the prima facie case. Ultimately, the Fourth Circuit held that *Nassar* did not apply in retaliation claims under Title VII. "The causation standards for

establishing a prima facie retaliation case and proving pretext are not identical. Rather, the burden for establishing causation at the prima facie stage is 'less onerous'." *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989).

> "Adopting the contrary rule (and applying the ultimate causation standard at the prima facie stage) would be tantamount to eliminating the *McDonnell Douglas* framework in retaliation cases by restricting the use of pretext evidence to those plaintiffs who do not need it: If plaintiffs can prove but-for causation at the prima facie stage, they will necessarily be able to satisfy their ultimate burden of persuasion without proceeding through the pretext analysis. Conversely, plaintiffs who cannot satisfy their ultimate burden of persuasion without the support of pretext evidence would never be permitted past the prima facie stage to reach the pretext stage. Had the *Nassar* Court intended to retire *McDonnell Douglas* and set aside 40 years of precedent, it would have spoken plainly and clearly to that effect. *Cf. Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 563, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (stating that the *Conley* pleading standard "has earned its retirement" and "is best forgotten"). But it did not do so. We therefore hold that *Nassar* does not alter the causation prong of a prima facie case of retaliation." *Foster* @ p. 251.

Finally, The Defendant utterly fails to provide any precedential authority or case law to support its argument that the Plaintiff's retaliation claim under 42 USC §1981 should be dismissed. Section 1981(a) provides:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

*See Honor v. Booz–Allen & Hamilton, Inc.,* 383 F.3d 180, 188 (4th Cir.2004); *see also CBOCS W., Inc. v. Humphries,* 553 U.S. 442, 446, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008) (confirming that " § 1981 encompasses retaliation claims"). "We observe that, although the elements of prima facie Title VII and § 1981 retaliation claims are identical, the causation standard for a Title VII claim may differ from that for a § 1981 claim after the Supreme Court's decision in *University of Texas Southwestern Medical Center v. Nassar,* —— U.S. ——, 133 S.Ct. 2517, 186 L.Ed.2d 503

(2013) (holding that but-for standard of causation applies to Title VII retaliation claims)." *Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d 264, 281 (4th Cir. 2015).

Hence, this court should be bound only by the precedential authority of the Fourth Circuit as stated in *Fountainebleau* and *Nassar* rather than by that of the Eastern District of Virginia as suggested by the Defendant @ p. 9 of its memorandum.

The Defendant next argues that the Plaintiff's allegations related to retaliation are conflicting and that the Plaintiff "cannot have it both ways." The Federal Rules of Civil Procedure, however, specifically allow a party to state many separate claims, regardless of consistency. Fed.R.Civ.P. 8(d). In *McKay Consulting, Inc. v. Rockingham Mem'l Hosp.*, 665 F. Supp. 2d 626, 632–33 (W.D. Va. 2009), the facts show that McKay pleaded alternative theories of recovery in Counts One and Two, for express and implied-in-fact contract, respectively. Under Count One, McKay alleged that "RMH agreed to these terms orally." (Compl. ¶ 62). Under Count Two, McKay alleges that RMH agreed to McKay's terms through its conduct. (Compl. ¶ 69.) The court held that although McKay may be unable to prevail on both theories, at the Rule 12(b)(6) stage McKay was entitled to allege alternative facts and theories which support different and contradictory claims for relief. Hence, McKay was not foreclosed from alleging the existence of both an express contract and a contract implied-in-fact. *See* Fed.R.Civ.P. 8; *see also United Roasters, Inc. v. Colgate–Palmolive Co.,* 649 F.2d 985, 990 (4th Cir.1981) (stating that Rule 8 "permits the pleading of alternative or inconsistent claims").

At this stage, the Plaintiff here would be remiss if she failed to include all allegations she may have against all Defendants. As in any case, the process of discovery will fine tune and parse the allegations as the matter proceeds through litigation. Based on the foregoing, the

Plaintiff has alleged facts which are sufficient to withstand the Defendant P&G's Motion to Dismiss the claims of Retaliation under Title VII, as well as 42 USC § 1981.

## II.     PLAINTIFF'S CLAIMS FOR RACE DISCRIMINATION AND DISPARATE TREATMENT UNDER TITLE VII, NCGS §143-422.2 AND 42 USC §1981 SHOULD NOT BE DISMISSED

Pursuant to Title VII, it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge or demote any individual, *or otherwise to discriminate* against any individual with respect to his compensation, *terms, conditions, or privileges of employment*, because of such individual's race, color, or national origin according to Title VII of the Civil Rights Act of 1964, as amended in 1991, § 703(a)(1), 42 U.S.C. § 2000e-2(a)(1) (1997).[1]

In *Dolgaleva vs. Va. Beach City Pub. Sch.*, 364 Fed.Appx. 820 (4th Cir. 2010), the defendant moved to dismiss the plaintiff's complaint pursuant to Rule 12(b)(6) arguing that the bare and conclusory allegations in the complaint were insufficient to state a claim for which relief could be granted. The Fourth Circuit reversed the district court's grant of the defendant's motion to dismiss opining that *Dolgaleva* brought a claim under Title VII and §1981. In her complaint, the plaintiff alleged that she applied for a teaching position, was the most qualified applicant based on her credentials, but was not hired. The court considered all of the allegations in the complaint as true, and therefore found that the district court erred in finding her pleading insufficient.

To establish a prima facie case of discrimination, a Plaintiff must show: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse employment action, she was performing at a level that met the employer's legitimate job expectations; and (4) the adverse employment action occurred "under circumstances which

give rise to an inference of unlawful discrimination." *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 851 (4th Cir.2001). Here, the Defendant argues that the Plaintiff failed to plead facts to plausibly allege that she was performing at a level that met her employer's legitimate expectations or that she suffered any adverse employment because of her race. However, nothing could be further from the truth. The Amended Complaint is full of such allegations.

First of all, the Plaintiff performed her job satisfactorily and ***did not receive any reprimands or complaints regarding her job performance;*** nor was there an investigation initiated against her until *after* she complained of race discrimination and disparate treatment in the workplace. (Amended Complaint ¶42). Further, at no time during her working relationship with Spillmann and Wright did either complain to the Plaintiff about her job performance or question any of the care she provided to any employee of P&G. (Amended Complaint ¶36).

Next, the Defendant argues that the Plaintiff fails to allege facts that the adverse employment action(s) occurred under circumstances which give rise to an inference of unlawful discrimination. In support of its argument, the Defendant clearly requires the court to view the facts in the light most *favorable to the Defendant*. However, the law is well settled that Rule 12(b)(6) demands that the court view the facts in the light most favorable to the Plaintiff, drawing all inferences therefrom. Here, the Plaintiff alleges that Wright, a white female, was hired to the position of Nurse Manager and had less education and work experience with P&G than Plaintiff. (Amended Complaint ¶¶5, 14). Notwithstanding, Wright was compensated at a higher rate than the Plaintiff. Wright was not only compensated at a higher rate than she, but also was provided training that would advance her career which was denied to the Plaintiff. In its memorandum in support of its Motion to Dismiss, the Defendant speculates that Wright may

---

[1] "[T]he North Carolina Supreme Court has explicitly adopted the Title VII evidentiary standards in evaluating a state claim under §143–422.2 insofar as they do not conflict with North Carolina statutes and case law." *Hughes v.*

have been paid more because of the timing of Wright's hire. Yet again, Rule 12(b)(6) requires the court to view the facts in the light most favorable to the Plaintiff.

The Plaintiff's allegations as a whole support her claim of race discrimination based on disparate treatment. (Amended Complaint ¶¶27, 28, 29). These allegations not only point to instances of individual disparate treatment related to Wright, but also a pattern of disparate treatment when she applied for a promotion to the Nurse Manager position, as well as when she applied for the position with the disability board. (Amended Complaint ¶¶11, 12, 13, 23, 25). Defendant entirely misses the point of the Plaintiff's allegation regarding the board application. It's speculation that the Plaintiff gave up and did not take any further steps to apply for the position to the board is erroneous. The allegation states that the application ***could not*** be submitted because the Plaintiff was not supported by her managers. Treating certain people less favorably than others on the basis of a protected classification is the essence of disparate treatment. *See Carter v. Ball,* 33 F.3d 450, 456 n. 7 (4th Cir.1994).

A plaintiff's prima facie case of discrimination (as defined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668, and subsequent decisions), combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, may be adequate to sustain a finding of liability for intentional discrimination under the ADEA. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000).[2]

The Plaintiff's allegations are sufficient to show that she was treated less favorably than her similarly situated white co-worker with regard to the terms and conditions of employment. It further shows that company policy was not followed when the Plaintiff sought the Nurse

---

*Bedsole,* 48 F.3d 1376, 1383 (4th Cir.1995) (citation omitted).
[2] Reeves has been extended to include all forms of discrimination.

manager position in 2013 and would not support her application for a board position in 2017. Based on the foregoing, the Plaintiff's Amended Complaint sufficiently states facts to support a claim of race discrimination based on disparate treatment pursuant to Title VII, NCGS §143-422.2 and 42 USC ¶1981.

## III.     PLAINTIFF'S CLAIM FOR DEFAMATION SHOULD NOT BE DISMISSED

Slander *per se* is "an oral communication to a third party which amounts to (1) an accusation that the plaintiff committed a crime involving moral turpitude; (2) an allegation that impeaches the plaintiff in his trade, business, or profession; or (3) an imputation that the plaintiff has a loathsome disease." *Id.* When the defamatory words are spoken with an intent that the words be reduced to writing, and the words are in fact written, the publication is both libelous and slanderous. *See Clark v. Brown,* 99 N.C.App. 255, 261, 393 S.E.2d 134, 137, *disc. review denied,* 327 N.C. 426, 395 S.E.2d 675 (1990). "[F]alse words imputing to a merchant or business man conduct derogatory to his character and standing as a business man and tending to prejudice him in his business are actionable, and words so uttered may be actionable *per se.*" *Badame v. Lampke,* 242 N.C. 755, 757, 89 S.E.2d 466, 468 (1955).

Defendant argues that the Plaintiff failed to allege that P&G made any defamatory statements to a third party.  Yet, it concedes and admits that the plaintiff alleges that Wright made false statements to the Board "at the instruction of the Defendant P&G." It is well settled that an individual member of a limited liability company or an officer of a corporation may be individually liable for his or her own torts, including negligence. *See Wilson v. McLeod Oil Co.,* 327 N.C. 491, 518, 398 S.E.2d 586, 600 (1990) (an officer of a corporation "can be held personally liable for torts in which he actively participates [,]" even though "committed when acting officially" (citation and quotation marks omitted)). This holding is consistent with the

principle that **agents of corporations and the corporations themselves may both be held liable** for the agent's torts committed in the course and scope of the agency relationship under the doctrine of *respondeat superior. See, e.g., Mills v. Mills,* 230 N.C. 286, 52 S.E.2d 915 (1949). *Woodson v. Rowland*, 329 N.C. 330, 348, 407 S.E.2d 222, 232–33 (1991). The Plaintiff further alleges that Wright was acting within the scope of her employment when she made defamatory statements about her to Spillmann and when Wright, at the instruction of P&G officials, made defamatory statements to the Board. (Amended Complaint ¶¶81, 82, 91, 92, 93). Consequently, and contrary to the Defendant's argument, under Rule 8 the Plaintiff can allege the same claim against both Defendants.

Finally, Plaintiff has sufficiently alleged that she suffered harm. Spillmann and Wright intentionally and willfully manipulated P&G to cease its relationship with the Plaintiff; and caused the Plaintiff to incur significant pecuniary and non-pecuniary losses based primarily on employment termination. (Amended Complaint ¶¶40, 81, 88, 95). Because the Defendant P&G has failed entirely to cite any precedential authority in support of its motion to dismiss the Plaintiff's defamation claim, and Plaintiff has alleged each element of defamation, the Motion to Dismiss should be denied.

## IV. PLAINTIFF'S CLAIM FOR CIVIL CONSPIRACY SHOULD NOT BE DISMISSED

The elements of a civil conspiracy are: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Privette v. University of North Carolina,* 96 N.C.App. 124, 139, 385 S.E.2d 185, 193 (1989). The doctrine of intracorporate immunity holds that, since at least two persons must be present to form a conspiracy, a corporation cannot conspire with itself, just as an individual

cannot conspire with himself. *Buschi v. Kirven,* 775 F.2d 1240, 1251–52 (4th Cir.1985). An allegation that a corporation is conspiring with its agents, officers or employees is tantamount to accusing a corporation of conspiring with itself. *Id.* However, an exception to the doctrine exists if the corporate agent has an "independent personal stake in achieving the corporation's illegal objective." *Id.* (citing *Greenville Publishing Co., Inc., v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir.1974)).

The Defendant argues that all of the alleged conspirators in this case were agents of P&G, and therefore a corporation cannot conspire against itself. Here, the Plaintiff alleges several of the Defendant's agents, including Wright, Spencer and Rouleau conspired with Spillmann to accomplish her termination. The inclusion of Spillmann in the conspiracy defeats the Defendant's argument since Spillmann had an independent personal stake in achieving the corporation's illegal objective. (Amended Complaint ¶¶81, 82, 91, 92, 93).

In *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 444, 666 S.E.2d 107, 115 (2008), the NC Court of Appeals reversed the trial court's dismissal of a civil conspiracy claim. There, Heflin was the owner of Ridgeway Brands Manufacturing, LLC, a company that manufactured tobacco, and sold it to Ridgeway Brands, Inc. Edwards and White were owners and active managers of Ridgeway Brands, Inc. In 2003, the companies merged causing all three men to have complete control and authority over Ridgeway Brands. In 2004, the Plaintiff instituted an action to recover escrow deposits and an injunction prohibiting them from selling cigarettes for two (2) years. The trial court dismissed claims against Heflin for civil conspiracy concluding that such a claim was tantamount to conspiring against oneself. The appeals court, however, ruled otherwise. It concluded that the Plaintiff alleged in its complaint that an agreement existed between Heflin, Edwards and White to violate the law under a

common scheme which caused injury to the Plaintiff. Further, that the Defendants shared an understanding to enter into the agreement for the purpose of underpricing cigarettes which would essentially deprive the State of North Carolina money. The court opined that the benefit accruing to Heflin from the conspiracy "was not merely the benefit associated with the profitability of the corporation" since Heflin allegedly directed monies intended to Ridgeway to either Edwards, White or himself. This, along with the allegation that Heflin's real reason for doing so was to keep others from tracking the money back to where it came from, was sufficient to support the theory that Heflin had an independent personal stake in achieving the corporation's illegal objective. Thus, precluding dismissal of the conspiracy claim.

*Ridgeway* is analogous to the present facts wherein Spillmann's goal of covering up his untimely, inappropriate invoices for services rendered and of having someone other than the Plaintiff assess and approve his invoices, created an independent personal stake in achieving the corporation's discriminatory and retaliatory objective related to the Plaintiff's employment.

For the aforementioned reasons, the Defendant's Motion to Dismiss on this issue should be denied.

## CONCLUSION

Because dismissal under Rule 12(b)(6) is extreme, it should only be granted where there can be no relief for the Plaintiff under the facts. Here, that is clearly not the case. Consequently, the Plaintiff prays the court for an Order DENYING the Defendant P&G's Motion to Dismiss the Plaintiff's Amended Complaint.

This the 15th day of June, 2018.

GRAY NEWELL THOMAS, LLP

BY:    <u>/s/ Angela Gray</u>
Angela Newell Gray
7 Corporate Center Court, Suite B
Greensboro, NC  27408
Telephone:    (336) 285-8151
Facsimile:    (336) 458-9359
Email:    angela@graynewell.com
*Attorney for Plaintiff*
NC Bar # 21006

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION
Civil Action No. 1:18-cv-133-WO-LPA

| | | |
|---|---|---|
| Dorothea Robinson, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| vs. | ) | *Certificate of Service* |
| | ) | |
| | ) | |
| The Proctor & Gamble Manufacturing | ) | |
| Company, Scott Spillmann, MD and | ) | |
| Candy Wright, | ) | |
| *Defendants*. | ) | |

I, Angela Newell Gray, Attorney for the Plaintiff, do hereby certify that I served the foregoing Plaintiff's Response in Opposition to the Defendant P&G's Motion to Dismiss the Plaintiff's Amended Complaint upon counsel for the Defendants shown below by electronically filing the same with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following attorney of record;

Robin Davis at Robin.Davis@jacksonlewis.com
Caitlin Goforth at Caitlin.Goforth@Jacksonlewis.com
Perry Henson, Jr. at phenson@hensonlawyers.com
Nicole Scallon at nscallon@hensonlawyers.com

This the 15th day of June, 2018.

/s/ Angela Gray
Angela Newell Gray
Gray Newell Thomas, LLP
7 Corporate Center Court, Suite B
Greensboro, NC  27408
Tel:     (336) 285-8151
Fax:     (336) 458-9359
Email: angela@graynewell.com
NC State Bar #21006

<u>VERIFICATION OF COMPLIANCE WITH LOCAL RULE 7.3(d)(1)</u>

The undersigned hereby verifies that the foregoing brief does not exceed 6,250 words.

This the 15th day of June, 2018.

<u>/s/ Angela Gray</u>
Angela Newell Gray
Gray Newell Thomas, LLP
7 Corporate Center Court, Suite B
Greensboro, NC  27408
Tel:     (336) 285-8151
Fax:     (336) 458-9359
Email: angela@graynewell.com
NC State Bar #21006